**LOWENSTEIN SANDLER PC**
Kenneth Rosen, Esq.
Jeffrey A. Kramer, Esq.
Thomas A. Pitta, Esq.
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

*Proposed Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Last Mile Inc. d/b/a/ Sting Communications | Case No. 11-14769 (SHL) |
| Debtor. | |

**AFFIDAVIT PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**
**AND IN SUPPORT OF THE DEBTOR'S PETITION AND FIRST DAY MOTIONS**

**DAROL LAIN**, pursuant to 28 U.S.C. § 1746, declares as follows:

1.     I am the President and Chief Executive Officer of Last Mile Inc. (the "**Debtor**").

2.     This Affidavit (the "**Affidavit**") is being submitted (a) pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**") and (b) in support of the relief requested in the motions (each, a "**First Day Motion**" and, collectively, the "**First Day Motions**") which have been or will be filed with the Court in connection with the commencement of these chapter 11 cases.  Except as otherwise indicated herein, all facts set forth in this Affidavit are based upon my personal knowledge of the Debtor's operations and finances and information gathered from a review of relevant documents, or provided to me by other members of the Debtor's management.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

3.      Part I of this Affidavit sets forth the information required by Local Rule 1007-2(a) regarding the nature of the Debtor's business and a concise statement of the circumstances leading to the commencement of these chapter 11 cases.  Several schedules are attached to this Affidavit, which provide additional information required by Local Rule 1007-2(a).

4.      Part II of this Affidavit describes the First Day Motions.  I have reviewed the relief sought in each First Day Motion and believe the relief requested therein is necessary to enable the Debtor to continue to operate in chapter 11 and to permit the Debtor to successfully reorganize and maintain the value of its assets and businesses.  Accordingly, for the reasons set forth herein, I believe the relief sought in the First Day Motions is in the best interests of the Debtor, its estate, creditors, and other parties in interest in these cases.

## PART I

### NATURE OF THE DEBTOR'S BUSINESSES AND CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

**A.      In General.**

5.      On October 12, 2011 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

6.      The Debtor intends to operate its business and manage its properties as a debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

7.      I am advised by the Debtor's bankruptcy counsel that this Court has jurisdiction over this chapter 11 case pursuant to 28 U.S.C. §§ 157 and that venue of this case and the First Day Motions is proper in the United States Bankruptcy Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      In order to enable the Debtor to effectively transition to chapter 11 and to minimize the effects of the chapter 11 filing, the Debtor has requested various types of relief in the First Day Motions filed, or which will be filed, with this Court.  The relief sought in the First Day Motions is limited to that which is essential to allow the Debtor to transition to chapter 11.

**B.      Nature and History of the Debtor's Business.**

9.      Last Mile Inc. is a telecommunications services company delivering advanced Ethernet transport services.  Doing business as Sting Communications, the Debtor is a proven leader in the transformation of telecommunications services, delivering advanced, MPLS/IP-based services to the Education, Healthcare, Government and Enterprise markets.  The Debtor specializes in designing, implementing and managing Wide Area Networks (WANs) that leverage the power of Internet Protocol (IP) to link the customers' locations securely, efficiently and cost effectively to support delivery of advanced applications, voice, data and video at scalable broadband speeds.  The Debtor has effectively deployed large-scale, fully managed Ethernet networks that utilize network facilities of other companies – its partners – in addition to Debtor's own network facilities, to optimize delivering the application requirements of Debtor's customers.  Effectively, Debtor virtualizes the WAN in order to facilitate affordable high-speed networks in rural and underserved locations.

10.      The Debtor employs approximately twenty-nine (29) persons and have a monthly payroll of approximately $ 190,000.

11.      Founded in 1999 as a wireless Internet Service Provider, the Debtor has evolved to become a high growth telecommunications service provider of Ethernet transport and managed services.  Since new management joined in 2003, the Debtor has grown by more than 500% and established the Debtor as a regional leader in providing high speed broadband to the markets it serves.  The Debtor's break-out growth began in 2006 through a series of contracts to serve the

Pennsylvania K-through-12 education market. During that year, the Debtor won multiple contracts serving over 50 school districts in three Intermediate Units. The Debtor's strategy to deploy state-of-the-art Carrier Ethernet technology in rural and underserved markets generated rapid acquisition of market share and outstanding customer satisfaction. With strong referrals from these initial education customers, the Debtor was awarded similar contracts in 2007 covering IU 5, 6, 11 and 28 representing nearly half of the geographic area of Pennsylvania. The Debtor's market expansion during this second year supported its network expansion into Philadelphia, State College, Pittsburgh, Erie and Cleveland.

12. Today, the Debtor provides service to over 33% of the state's school districts and the statewide education network serving all of Pennsylvania's Intermediate Units. In 2009, the Debtor accelerated its expansion into the healthcare market in Pennsylvania, with a major contract to serve over 20 rural hospitals.

**C.    Pre-Petition Indebtedness And Capital Structure.**

**i.    Secured Debt**

13. The Debtor's liabilities include a secured credit facility in the approximate aggregate amount of $6,600,000.00 evidenced by a Credit Agreement among the Debtor and M&T Bank f/k/a Wilmington Trust ("**M&T Bank**") dated as of May 19, 2008, as amended on various dates (the "**Prepetition Credit Agreement**"). The Debtor is a borrower under the Prepetition Credit Agreement and substantially all of its assets are pledged as collateral for the obligations thereunder.

**ii.    Unsecured Indebtedness.**

14. As of the Petition Date, the Debtor collectively has approximately $2,700,000.00 in outstanding obligations to trade creditors and other vendors. The Debtor's unsecured debt totaled approximately $15,000,000.00.

### iii.     Equity.

15.     On the Petition Date, the Debtor had approximately 75 stockholders of record and 19,836,200 shares of common stock were outstanding (the "Common Stock"). The Debtor's Common Stock is not publicly traded.

## D.     Events Leading To The Chapter 11 Case.

16.     The Debtor is operationally and financially sound. The Debtor's monthly cash flow includes approximately $730,000 in monthly recurring receipts for the broadband services it provides to schools, hospitals and other enterprise customers; and, approximately $670,000 in total recurring expenses including cost of sales, payroll, interest expenses to its Senior Secured Lender, M&T Bank, and other ongoing costs. Approximately $280,000 of the Debtor's monthly recurring receipts has been held by the Universal Service Administrative Corporation ("USAC") since May, 2011, which has caused the Company to fall behind in its payments to vendors. USAC is a federal funding source that subsidizes telecommunications services for schools and libraries.

17.     Substantially all of the Debtor's suppliers have been working with the Debtor during this process; however, on October 1, 2011, First Telecom Services ("**First Telecom**"), a fiber-optic supplier to the Debtor, informed the Debtor that it would discontinue service to the Debtor at midnight on Wednesday, October 12, 2011, unless the Debtor paid all past due amounts totaling $414,986.15 plus an aggregate profit sharing payment that First Telecom estimates to be between $3 million and $8.7 million. The Debtor did not have the cash available to pay the past due amounts, and disagrees with First Telecom's assertion that a profit sharing amount is owed. Negotiations between October 3, 2011 (when the Debtor received notice from First Telecom), and October 12, 2011 were unsuccessful, which precipitated the filing of the Debtor's chapter 11 petition.

18.     If First Telecom would have terminated the service and underlying contracts, the Debtor would have been unable to provide service to all of its customers, including over 180

school districts in Pennsylvania as well as over 40 rural hospitals. In addition, the Debtor's enterprise value would have virtually destroyed.

19. Accordingly, the Debtor took the unfortunate but necessary step of filing its voluntary petition to protect its business and preserve the value of its assets.

20. In view of the foregoing events, the Debtor initiated steps to develop possible restructuring plans or strategic alternatives. After assessing these alternatives, the Debtor determined that a sale of its businesses will most effectively preserve and maximize the value of its estate for the benefit of its creditors. Prior to the Petition Date, the Debtor retained Griffin Financial ("**Griffin**), to act as its financial advisor with respect to evaluating and pursuing a sales transaction. The Debtor had recently initiated a marketing process to facilitate the sale of its business. Through this chapter 11 case, the Debtor intends to stabilize its day-to-day operations, avail itself of the protective provisions of the Bankruptcy Code, and preserve and protect the value of its assets for the benefit of its creditors. The Debtor believes that, under the protection of the Bankruptcy Code, it will be able to maximize the value of its assets for the benefit of all creditors and propose and implement a plan of reorganization.

**E.      Other Information Required Pursuant To Local Bankruptcy Rule 1007-2.**

21. Pursuant to Local Bankruptcy Rule 1007-2(a)(3), to the best of my knowledge, information and belief, no committee was formed prior to the order for relief in this chapter 11 case.

22. Pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Schedule 1** includes a list of the names, addresses and, where available, telephone numbers, of the creditors of the Debtor holding the consolidated twenty largest unsecured claims. Such list includes the amount of the claim, the nature of the claim (*i.e.*, trade debt, real property leases, etc.) and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed or partially secured.

23.     Pursuant to Local Bankruptcy Rule 1007-2(a)(5), **Schedule 2** includes a list of the names and addresses of the Debtor's secured creditors. This list includes the amount of each claim, a brief description of the collateral securing the claim.

24.     Pursuant to Local Bankruptcy Rule 1007-2(a)(6), **Schedule 3** includes a summary of the assets and liabilities of the Debtor.

25.     No shares of stock, debentures or other securities of the Debtor are publicly held. Accordingly, I am advised by counsel that Local Bankruptcy Rule 1007-2(a)(7) is inapplicable in these cases.

26.     Pursuant to Local Bankruptcy Rule 1007-2(a)(8), to the best of my knowledge, information and belief, the Debtor does not have any property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity.

27.     Pursuant to Local Bankruptcy Rule 1007-2(a)(9), **Schedule 4** lists all of the Debtor's owned and leased premises.

28.     Pursuant to Rule 1007-2(a)(10), the location of the Debtor's substantial assets, including furniture, fixtures, equipment, and other personal property is 120 S. 16th Street, Lebanon, Pennsylvania 17042. The Debtor's books and records are also located at this location.

29.     Pursuant to Rule 1007-2(a)(11), **Schedule 5** lists the pending actions or proceedings against the debtor or its property.

30.     Pursuant to Rule 1007-2(a)(12), **Schedule 6** includes the names of the individuals who comprise the Debtor's existing senior management.

31.     Pursuant to Rule 1007-2(b)(1), the estimated gross amount of payroll obligations to employees of the Debtor (exclusive of officers, directors and members) for the thirty

(30) day period following the commencement of the Debtor's chapter 11 case is approximately $157,000.00.

32.     Pursuant to Rule 1007(b)(2), **<u>Schedule 7</u>** includes the amounts that will be paid to the Debtor's officers, stockholders, members and financial or business consultants for services for the thirty (30) day period following the commencement of the Debtor's chapter 11 case.

33.     Pursuant to Rule 1007-2(b)(3), **<u>Schedule 8</u>** includes the Debtor's projected 13-week cash flow.

**<u>PART II</u>**

**FACTS IN SUPPORT OF FIRST DAY MOTIONS**

34.     The Debtor filed the First Day Motions concurrently with the filing of its chapter 11 petition. The Debtor requests that each of the First Day Motions be granted, as each constitutes a critical element in achieving a successful and smooth transition to chapter 11.

35.     For a more detailed description of the First Day Motions, the Debtor respectfully refers the Court to the respective First Day Motions. To the extent that this Affidavit and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control.

**A.     Debtor's Motion For Interim And Final Orders Under Section 105, 361, 362 And 363 Of The Bankruptcy Code Approving The Use Of Cash Collateral, Providing Adequate Protection And Setting A Final Hearing Pursuant To Bankruptcy Rule 4001 (the "<u>Cash Collateral Motion</u>").**

36.     As stated above, the Debtor is indebted to M&T Bank in the aggregate amount of approximately $6,600,000.00 plus accrued interest. Without the immediate use of M&T Bank's cash collateral (the "<u>**Cash Collateral**</u>"), the Debtor will be unable to pay salaries, rent, utilities and other operating expenses incurred in the ordinary course of business and may be forced to cease

operations and terminate over twenty-nine (29) employees. Thus, the Debtor's ability to preserve and maximize the value of its assets for all creditors (secured and unsecured) will be critically impaired, and its ability to reorganize will be substantially jeopardized absent authority to use the Cash Collateral. Accordingly, the Debtor seeks the entry of an interim, and subsequently a final, order authorizing the use of the Cash Collateral pursuant to the budget annexed to the Cash Collateral Motion as Exhibit A (the "**Cash Collateral Budget**"), subject to a variance equal to the greater of ten percent (10%) of the expenses set forth in the Cash Collateral Budget. To the extent amounts set forth in the Cash Collateral Budget are not used in a given period, they may be spent in any subsequent period(s).

37.     Through the use of Cash Collateral, the Debtor will be able to maintain its operations as going concerns while protecting, preserving and maximizing the value of its assets for all creditors including the Secured Creditors. In order to adequately protect the Secured Creditors' rights, the Debtor proposes to grant the Secured Creditors replacement liens on all of the Debtor's postpetition assets to the extent of any diminution in the value of the prepetition collateral.

38.     The Debtor submits that the proposed replacement liens and payment of interest will adequately protect the Secured Creditors within the meaning of section 361 of the Bankruptcy Code and maintains that it should be authorized to use the Cash Collateral in accordance with the Cash Collateral Budget.

**B.** **Motion For An Order Pursuant To 11 U.S.C. §§ 105(a), 363(c), 345(c) And 1107 (I) Authorizing The Debtor To Continue Using Its Existing Cash Management System, Bank Accounts And Business Forms, (II) Granting An Interim And Final Waiver Of The Deposit Guidelines Set Forth In 11 U.S.C. § 345 And (III) Granting Related Relief (the "Cash Management Motion").**

      **i.** **Bank Accounts**

39.     Prior to the Petition Date, as part of its ordinary business practices, the Debtor maintained approximately six (6) bank accounts in three (3) banks, a cash management system, business forms and checks. The Debtor does not currently have any investment accounts.

40.     To avoid disruption to the ordinary and usual cash management and day-to-day operations of the Debtor, and to ensure an orderly transition into chapter 11, the Debtor respectfully requests an order authorizing the Debtor to continue to use its existing bank accounts, cash management system, checks, and business forms.

41.     The Debtor also requests that the banks at which the Debtor maintains its existing accounts be entitled to receive payment of both prepetition and postpetition services and other fees, costs, charges, and expenses to which such banks may be entitled under the terms of, and in accordance with, their contractual arrangements with the Debtor.

42.     Accordingly, through the Cash Management Motion, the Debtor seeks entry of an order pursuant to sections 105, 362(a), 363(c)(1), 1107 and 1108 of the Bankruptcy Code:

     a.     authorizing the Debtor, on the terms set forth in the Cash Management Motion, to continue to consolidate the management of its cash if and as necessary, without interruption in the ordinary course of business;

     b.     directing that the banks at which the Debtor maintains accounts (the "**Cash Management Banks**") are stayed from offsetting, affecting or otherwise impeding the use or transfer of or access to any funds, contained or deposited in the bank accounts, from all bank accounts which are utilized in the Debtor's day-to-day operations (collectively, the "**Accounts**,"

a list of which is set forth on <u>Exhibit A</u> to the Cash Management Motion) on or subsequent to the commencement of this chapter 11 case for any reason or on account of any claim (as defined in section 101(5) of the Bankruptcy Code) of the Cash Management Banks;

c.      directing the Cash Management Banks to transfer, in accordance with prepetition practices, or at the request and direction of the Debtor, any funds in the Accounts to the extent set forth herein;

d.      authorizing the Debtor to maintain and continue to use, with the same account numbers, the Accounts maintained with the Cash Management Banks, and directing that all such Accounts be treated for all purposes as Accounts of the Debtor as debtor-in-possession;

e.      authorizing and directing the Cash Management Banks to service and administer the Accounts without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks and drafts drawn on the Accounts, whether presented, drawn or issued before or after the Petition Date for payment by the holders or makers thereof, for any obligations of the Debtor for which payment is authorized by Court Order, provided that sufficient funds exist, whether deposited prior or subsequent to the commencement of the Debtor's chapter 11 case, to cover such checks upon presentment;

f.      granting a waiver of the investment and depository guidelines of section 345 of the Bankruptcy Code; and

g.      authorizing the Debtor to use, in its present form, existing checks and other documents, including its existing business forms, relating to the Accounts, <u>provided</u>, <u>however</u>, that the Debtor shall add a "DIP" designation to its existing checks and other business forms.

**ii.     Cash Management System.**

43.      The Debtor submits that the nature of its financial affairs, coupled with the inherent delay and harm to the Debtor's estates and its creditors that would result if the Debtor were forced to discontinue its current cash management system, warrants the continuation of the Debtor's

current cash management system. Specifically, the time and expense required to discontinue the Debtor's current cash management system and implement new systems would result in a wasting of assets of the estate. Moreover, the commencement of the Debtor's chapter 11 case will undoubtedly place a substantial strain on the Debtor's relationships with its vendors, consultants, contractors and suppliers -- relationships that are vital to the Debtor's continued operations, which are necessary to the Debtor achieving a successful resolution of this chapter 11 case. Requiring the Debtor to open new debtor-in-possession bank accounts in substitution for its existing accounts would cause delay, confusion, and disruption to the Debtor's operations, further straining these relationships.

44. Prior to the Petition Date and in the ordinary course of business, the Debtor maintained six (6) bank accounts at M&T Bank, Graystone Bank and Northwest Savings Bank Receipts from the Debtor's operations are deposited into one of the foregoing accounts. Funds are then transferred between or from these accounts to pay Employees, vendors and other creditors. Disbursements are primarily made from the Debtor's checking account at M&T Bank. The Debtor's money market account at Graystone Bank serves as a reserve account and funds are transferred to the Debtor's checking account at M&T Bank on an as needed basis to fund disbursements.

45. The Debtor's certificate of deposit is pledged as security to Graystone Bank for a letter of credit issued to the Pennsylvania Game Commission. The letter of credit was issued pursuant to the Debtor's lease of property from the Pennsylvania Game Commission.

### iii. The Debtor's Business Forms.

46. The Debtor should be permitted to continue to use its existing business forms, including its existing check stock. A certain amount of time and expense would be required to print and obtain new checks and other forms. Notwithstanding the foregoing, the Debtor will stamp the legend "Debtor-In-Possession" or "DIP" on substantially all business forms utilized after the Petition Date.

### iv. Compliance with Section 345 Guidelines.

47.     The Debtor does not currently have any investment accounts.  However, to the extent applicable during the pendency of this bankruptcy case, the Debtor submits that sufficient cause exists to permit a waiver of the depository requirements articulated in section 345 of Bankruptcy Code.

48.     Requiring the Debtor to issue a bond in favor of the United States or to deposit securities, as section 345(b) requires, would cause substantial unnecessary expense to this estate. Granting a waiver of the requirements of section 345 of the Bankruptcy Code will facilitate a smooth and orderly transition of the Debtor's business into chapter 11 and minimize the disruption of this transition.

**C.     Debtor's Motion For Order Pursuant To 11 U.S.C. §§ 105(a), 507(a)(4) And (5) (I) Authorizing The Debtor To Pay Prepetition Wages, Salaries And Other Compensation And Related Taxes, (II) Authorizing The Debtor To Honor Workers' Compensation Obligations And To Continue Prepetition Employee Welfare Programs, And (III) Directing All Banks To Honor Prepetition Checks For Payment Of Prepetition Employee Obligations (the "<u>Wage</u> <u>Motion</u>").**

49.     The Debtor employs approximately twenty-nine (29) full time employees (the "<u>**Employees**</u>"). The Debtor also employs one (1)  independent contractors that works on-site substantially all of the time.

50.      The Employees' continued and uninterrupted service is essential to the Debtor's reorganization.  To minimize the personal hardship the Employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the Employees' morale during this critical time, the Debtor seeks authority to (i) pay all prepetition Employee claims for wages, salaries and other accrued compensation and related taxes up to the statutory cap of $11,725 per employee, (ii) make all payments for which Employee payroll deductions were made, (iii) reimburse all prepetition Employee business expenses, (iv) make prepetition contributions and pay benefits

under certain employee benefit plans, (v) honor workers' compensation obligations, (vi) pay other miscellaneous, employee-related costs, (vii) continue prepetition programs with respect to vacation, sick, personal and holiday leave and continue certain health, welfare, savings and other benefit programs as described more fully below (collectively, the "**Employee Obligations**").

51.    The Debtor also (i) requests that the Court authorize and direct applicable banks and other financial institutions to receive, process, honor and pay all prepetition checks and transfers drawn on the Debtor's accounts related to the Employee Obligations and (ii) seek authority to pay all processing costs and administrative expenses related to the foregoing payments.

## Summary of Prepetition Employee Obligations

### i.    Wages, Salaries and Other Compensation.

52.    The Debtor pays its employees on a bi-weekly basis. The Debtor's average bi-weekly payroll is approximately $ 93,000.00 including all related payroll taxes and garnishments. The Debtor uses the services of Paychex**,** Inc. to calculate and issue the Employees' paychecks and direct deposits. Payroll for the Debtor's Employees for the week of September 25, 2011, through and including October 8, 2011, was paid prior to the Petition Date with the exception of 401k contributions of $2,642.16. The Debtor may have accrued wages for the week of October 9, 2011.

53.    As of the Petition Date, the Debtor's outstanding payroll obligations may total approximately $37,200.00 (the "**Prepetition Wages**"). To the extent any such obligations are later determined to be due and owing, the Debtor requests authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

### ii.    Withholding Obligations.

54.    The Debtor routinely withholds from Employee wages certain amounts that the Debtor is required to transmit to third parties for such purposes as Social Security, Medicare, federal and state income taxes, Health and Welfare Plan (as defined below) contributions, defined

contribution retirement plan contributions, payroll deduction payment programs for various optional insurance programs, loan payments, union dues, garnishments, and child support and other similar orders (the "**Withholding Obligations**"). The Debtor believes that such withheld funds, to the extent that they remain in the Debtor's possession, are not property of the Debtor's bankruptcy estate.

### iii.     Vacations, Sick, Personal and Holiday Leave.

55.     In the ordinary course of business, and as is customary with most companies, the Debtor maintains various employee benefit plans and policies for the benefit of its Employees that provide such persons with vacation, holidays, sick time, and similar benefits (collectively, the "**Employee Benefits**").  Employees generally are not entitled to a cash payout for the Employee Benefits.  The Debtor anticipates that its Employees will utilize any accrued Employee Benefits without resulting in any material cash flow requirements beyond the Debtor's normal payroll obligations.  To the extent any such obligations are later determined to be due and owing, the Debtor requests authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

56.     The Debtor maintains a paid time off policy that does not permit employees to carry over paid time off from one year to the next or compensate employees for any accrued but unused pay time off.

57.     The Debtor anticipates that its Employees will utilize any accrued Employee Benefits in the ordinary course.

### iv.     Reimbursable Business Expenses.

58.     In the ordinary course of the Debtor's business, Employees may incur a variety of business expenses that are typically reimbursed by the Debtor pursuant to its normal business practices.  Employees travel regularly as part of their duties.  The reimbursable business expenses incurred by the Employees include business travel, business meals, car rentals, delivery expenses and

miscellaneous related expenses (collectively, the "**Reimbursable Business Expenses**"). All Reimbursable Business Expenses were incurred with the understanding that they would be reimbursed by the Debtor. As of the Petition Date, the Debtor estimates that there are approximately $2,500 unreimbursed Reimbursable Business Expenses. The Debtor does not believe that any individual Employee has incurred Reimbursable Business Expenses in excess of $1,000. To the extent any such obligations to any individual Employee exceed $1,000, the Debtor requests authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

      v.      **Insurance Benefits.**

      59.      In the ordinary course of its business, the Debtor provides medical and dental insurance to its eligible Employees through group plans offered by Gettysburg Health Administrators and Health Assurance, and provides Employees with certain insurance programs including life, disability, medical and health and dental (collectively, the "**Health Benefits**"). Eligible Employees are also entitled to participate in the Debtor's life and disability insurance programs offered by Met Life and Standard Insurance (the "**Life Insurance**" and, collectively with the Health Benefits, the "**Insurance Benefits**"). The Debtor's average monthly cost for the Insurance Benefits is approximately $24,059.11 before contributions from Employees.

      60.      Many of the Insurance Benefits are either partially or fully funded through Employee contributions. Other Insurance Benefits are fully insured with premiums paid by the Debtor or the Employees. Because of the manner in which expenses are incurred and claims are processed under the Insurance Benefits, it is difficult for the Debtor to determine the extent of obligations under the Health and Welfare Plans outstanding at any particular time. As of the Petition Date, the Debtor estimates it was current in its Insurance Benefits obligations. To the extent any such obligations are later determined to be due and owing, the Debtor requests authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

### vi. Savings Plan.

61.     The Debtor maintains a defined savings plan for its Employees, which is qualified under section 401(k) of the Internal Revenue Code (the "**Savings Plan**").  Pursuant to the Savings Plan, the Debtor deducts the appropriate amounts from each participating Employee's payroll check and transfers the withheld funds to the plan trustee.  As of the Petition Date, the Debtor estimates that it owes $2,642.16 to Great West in connection with the Savings Plan for payroll ending October 8, 2011.

### vii. Workers' Compensation Obligations.

62.     The Debtor is required under applicable law to maintain workers' compensation insurance policies and programs to provide Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtor.

63.     The Debtor maintains workers' compensation liabilities as required by the local laws of the jurisdictions in which they operate.  As of the Petition Date, the Debtor owes approximately $800.00 in connection with its workers' compensation obligations for the payroll period ended October 8, 2011.  To the extent any such obligations are later determined to be due and owing, the Debtor requests authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

### Authority for Banks to Honor and/or Reissue Checks

64.     The Debtor further requests that all applicable banks and other financial institutions be authorized to receive, process, honor and pay any and all check and transfers drawn on the Debtor's dedicated payroll accounts, whether such checks were presented before, on, or after the Petition Date.  Accordingly, by the Wage Motion, the Debtor seeks (i) authorization for, and/or ratification of, its banks' honoring of prepetition payroll checks and transfers on or after the Petition Date, (ii) authorization for the banks to process and honor all other checks issued for payments

approved by the Wage Motion, and (iii) authorization to reissue checks for payments approved by the Wage Motion whenever a check therefore is dishonored post petition.

**D.    Debtor's Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service on Account of Prepetition Invoices, (II) Deeming Utility Companies To Have Adequate Assurance of Future Payment, and (III) Establishing Procedures For Resolving Requests for Additional Assurance ("Utilities Motion").**

65.    By the Utilities Motion, the Debtor seeks entry of interim and final orders, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (a) prohibiting Utility Companies from discontinuing, altering or refusing service to the Debtor on account of prepetition invoices, (b) deeming Utility Companies to have adequate assurance of future performance on the basis of payment of a security deposit (the "**Utility Deposit**") and (c) establishing procedures for resolving requests for additional adequate assurance of future payments.

66.    The Debtor incurs utility expenses in the ordinary course of business for, among other things, electricity, gas, water and sewer service, telephone and cellular service, waste disposal and internet service. These utility services are provided by several utility providers (as such term is used in section 366 of the Bankruptcy Code, collectively, the "**Utility Companies**"), including those listed on **Exhibit C** to the Utilities Motion.[1] From and after the Petition Date, the Debtor expects to incur aggregate utility obligations of approximately $5,700 per month at its facilities. The Debtor believes it generally was current on utility payments as of the Petition Date.

---

[1]    While the Debtor have exercised reasonable efforts to list all of its Utility Companies in **Exhibit C** to the Utilities Motion, it is possible that certain Utility Companies may have been inadvertently omitted from the list. Accordingly, the Debtor reserves the right, pursuant to the terms and conditions of the Utilities Motion and without further order of the Court, to amend **Exhibit C** to the Utilities Motion to add any omitted Utility Company and to request that the relief set forth in the Utilities Motion apply to such entities. In addition, the Debtor reserves the right to argue that any of the entities now or hereafter listed in **Exhibit C** to the Utilities Motion are not "utilities" within the meaning of section 366(a) of the Bankruptcy Code.

67.     Uninterrupted utility services are essential to the continuation of Debtor's on-going operations and to the success of the Debtor's chapter 11 efforts.  The Debtor's operations will be negatively impacted if one or more Utility Company refuses or discontinues utility services for even a brief period of time.  Accordingly, any interruption of utility services, even for a brief period of time, would negatively impact the Debtor's customer relationships, revenues and profits, seriously jeopardizing the Debtor's reorganization efforts and, ultimately, value and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during these Chapter 11 cases.

### Adequate Assurance Of Payment

68.     Section 366 of the Bankruptcy Code prohibits a utility company from altering, refusing or discontinuing its service to a chapter 11 debtor within the first thirty (30) days of the bankruptcy filing (the "**Utilities Stay Period**").  Upon expiration of the Utilities Stay Period, section 366(b) of the Bankruptcy Code provides that a utility company may terminate services if the utility company has not received adequate assurance of payment from the debtor.

69.     Adequate assurance of payment, as defined in section 366(c)(1)(A) of the Bankruptcy Code, includes "a cash deposit, a letter of credit, a certificate of deposit, a surety bond, a prepayment of utility consumption or another form of security that is mutually agreed on between the utility and the debtor or trustee."  11 U.S.C. § 366(c)(1)(A).

70.     In accordance with the definition of adequate assurance of payment under section 366(c)(1)(A) of the Bankruptcy Code, the Debtor proposes to provide each Utility Company, as identified on **Exhibit C** to the Utilities Motion, with a Utility Deposit, equivalent to the estimated average value of utility consumption for a two-week period, also identified on **Exhibit C** provided that such Utility Providers provided that such Utility Provider does not already hold a deposit equal to or greater than two weeks of utility services, and provided further that such Utility Provider is not currently paid in advance for its services.  The Debtor further proposes to issue each Utility Deposit within ten (10) business days after the date of entry of the Final Order granting the Utilities Motion.

71.     Additionally, the Debtor seeks to establish reasonable procedures (the "**Adequate Assurance Procedures**") by which Utility Companies may request additional adequate assurance of future payment, in the event that a Utility Company believes that the Utility Deposit does not provide them with satisfactory adequate assurance. The Debtor proposes the following procedures:

a.      Absent any further order of this Court and except as otherwise provided herein, the Utility Companies may not alter, refuse or discontinue service to, or discriminate against, the Debtor on account of the commencement of this chapter 11 case or any unpaid prepetition charges, or request payment of an additional deposit or receipt of other security in connection with any unpaid prepetition charges.

b.      The Debtor will serve the Motion and the Interim Order, if granted by the Court, on each Utility Company via first-class mail, within two (2) business days following the entry of the Interim Order. In the event that any Utility Company was omitted from Exhibit C, the Debtor shall have the right to supplement Exhibit C and shall promptly provide notice of the Order upon learning of such Utility Company.

c.      Any Utility Company may request additional assurance of payment (an "**Additional Payment Request**") within thirty (30) days after the date the Motion is filed (the "**Additional Payment Request Deadline**") by submitting the request to counsel to the Debtor, Lowenstein Sandler PC, 1251 Avenue of the Americas, 18th Floor, New York, New York 10020, Attention: Jeffrey A. Kramer, Esq.

d.      Any Additional Payment Request must (i) be in writing, (ii) set forth the location for which utility services are provided, (iii) include a summary of the Debtor's payment history relevant to the affected account(s), including any security deposits or other prepayments or assurances previously provided by the Debtor, (iv) describe in sufficient detail the reason(s) why the treatment afforded pursuant to the procedures set forth herein does not constitute satisfactory adequate assurance of payment, and (v) include a proposal for what would constitute adequate assurance from the Debtor, along with an explanation of why such proposal is reasonable.

e.      If a Utility Company makes a timely Additional Payment Request that the Debtor believe is reasonable, the Debtor shall be authorized in its sole discretion to comply with such request without further order of the Court.

f.      If the Debtor believes that a Utility Company's Additional Payment Request is unreasonable and the parties are unable to agree, the Debtor will schedule a

hearing at the next omnibus hearing date scheduled in these cases (a "**Determination Hearing**") to determine if adequate assurance to such Utility Company is necessary, or if additional assurance as to payment to such Utility Company is necessary.

g. Pending resolution of a Utility Company's Additional Payment Request at a Determination Hearing, such Utility Company shall be prohibited from altering, refusing or discontinuing service to the Debtor.

h. If a Utility Company fails to send an Additional Payment Request by the Additional Payment Request Deadline, such Utility Company shall have waived its right to make an Additional Payment Request and shall be deemed to have received adequate assurance of payment in accordance with §366(c)(1)(A)(vi) by virtue of the Utility Deposit. Utility Companies that do not send Additional Payment Requests to the parties set forth above by the Additional Payment Request Deadline shall be collectively referred to as the "**Consenting Utility Companies**".

i. A Utility Company shall be deemed to have adequate assurance of payment unless and until a future order of this Court is entered requiring further adequate assurance of payment.

**E. Debtor's Motion Pursuant to Fed. R. Bankr. P. 1007(c) for An Order Granting The Debtor An Extension Of Time to File Schedules and Statement Of Financial Affairs ("Schedules Extension Motion").**

72.     Counsel has advised me that, pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, a debtor is required, within 15 days from the date of filing its petition, to file with the court (i) a schedule of assets and liabilities, (ii) a statement of financial affairs, (iii) a schedule of current income and expenditures, and (iv) a schedule of executory contracts and unexpired leases, required by Bankruptcy Rule 1007(a) (collectively, the "**Schedules and SOFA**"). The Debtor submits that cause exists for extending the time for filing the Schedules and SOFA.

73.     Although the Schedules and SOFA were not filed with the Debtor's petition, a list containing the names and addresses of the Debtor's twenty largest unsecured creditors was filed simultaneously with the Debtor's petition.

74.     The Debtor has commenced the extensive process of gathering the necessary

information to prepare and finalize the Schedules and SOFA, but believe that the 15-day time period to file the Schedules and SOFA provided by Bankruptcy Rule 1007 will not be sufficient to permit completion of the Schedules and SOFA.  As discussed above, on October 1, 2011, the Debtor's supplier, First Telecom, advised the Debtor that it was terminating its contract with the Debtor as a result of ongoing dispute between the parties.  This action precipitated the filing of the Debtor's chapter 11 petition.  The Debtor is gathering the necessary information in support of its chapter 11 petition and first day motions and then will focus on gathering the information for the Schedules and SOFA.

**<u>CONCLUSION</u>**

75.     For the reasons stated herein and in each of the First Day Pleadings, the relief sought therein is in the best interest of the Debtor, its creditors and the estates, and therefore, on behalf of the Debtor, I respectfully request that the First Day Orders be entered.

I declare under penalty of perjury of the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief.

<u>/s/ *Darol Lain*</u>
Darol Lain

Dated: October 17, 2011

# Schedule 1

## Top 20 Creditors List

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of claim |
|---|---|---|---|
| GLC (Global Leveraged Capital)<br>805 Third Avenue<br>20th Floor<br>New York, NY 10022 | GLC (Global Leveraged Capital)<br>805 Third Avenue<br>20th Floor<br>New York, NY 10022 | | 11,067,026.99<br>(Approx.) |
| First Telecom Services<br>3340 W Market St.<br>Akron, OH 44333 | First Telecom Services<br>3340 W Market St.<br>Akron, OH 44333 | | 453,758.84 |
| Boal, Drs. Richard and Dannielle<br>802 Michigan Avenue<br>Lemoyne, PA 17043 | Boal, Drs. Richard and Dannielle<br>802 Michigan Avenue<br>Lemoyne, PA 17043 | | 336,438.43 |
| Stevens & Lee<br>485 Madison Avenue, 20th Floor<br>New York, NY 10022 | Stevens & Lee<br>485 Madison Avenue, 20th Floor<br>New York, NY 10022 | | 322,127.25 |
| Hanks, Dr. and Mrs. Gregory<br>779 Pine Tree Road<br>Hummelstown, PA 17036 | Hanks, Dr. and Mrs. Gregory<br>779 Pine Tree Road<br>Hummelstown, PA 17036 | | 267,238.50 |
| Alcatel Lucent<br>P.O. Box 911476<br>Dallas, TX 75391 | Alcatel Lucent<br>P.O. Box 911476<br>Dallas, TX 75391 | | 234,611.64 |
| Prenskey, Dr. Jay<br>101 North 24th Street<br>Camp Hill, PA 17011 | Prenskey, Dr. Jay<br>101 North 24th Street<br>Camp Hill, PA 17011 | | 171,419.16 |
| Pheasant, Dr. Thomas and Linda<br>49 Hillcrest Road<br>Wormleysburg, PA 17043 | Pheasant, Dr. Thomas and Linda<br>49 Hillcrest Road<br>Wormleysburg, PA 17043 | | 171,419.16 |
| DAPER II / Board of Trustees<br>2770 Sand Hill Road<br>Menlo Park, CA 94025 | DAPER II / Board of Trustees<br>2770 Sand Hill Road<br>Menlo Park, CA 94025 | | 170,000.00<br>(Approx.) |
| CenturyLink<br>P.O. Box 1319<br>Charlotte, NC 28201 | CenturyLink<br>P.O. Box 1319<br>Charlotte, NC 28201 | | 168,869.05 |
| Zito Media<br>PO Box 309<br>Coudersport, PA 16915 | Zito Media<br>PO Box 309<br>Coudersport, PA 16915 | | 156,750.00 |

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of claim |
|---|---|---|---|
| Velocity Communications Inc<br>2503 West 15th Street<br>Suite 10<br>Erie, PA 16505 | Velocity Communications Inc<br>2503 West 15th Street<br>Suite 10<br>Erie, PA 16505 | Subject to Setoff | 138,750.00 |
| Comcast<br>Box 37601<br>Philadelphia, PA 19101 | Comcast<br>Box 37601<br>Philadelphia, PA 19101 | | 134,400.00 |
| Nguyen, Dr. and Mrs. Thatch (Moffitt)<br>1030 Fairdell Drive<br>Hummelstown, PA 17036 | Nguyen, Dr. and Mrs. Thatch (Moffitt)<br>1030 Fairdell Drive<br>Hummelstown, PA 17036 | | 114,279.44 |
| Windstream<br>P.O. Box 9001908<br>Louisville, KY 40290 | Windstream<br>P.O. Box 9001908<br>Louisville, KY 40290 | | 108,453.44 |
| Frensky, Jeane<br>5395 Oxford Chase Way<br>Dunwood, GA 30338 | Frensky, Jeane<br>5395 Oxford Chase Way<br>Dunwood, GA 30338 | | 108,126.07 |
| Barsanti , Dr. Christopher<br>401 Kent Road<br>Greenville, NC 27858 | Barsanti , Dr. Christopher<br>401 Kent Road<br>Greenville, NC 27858 | | 57,139.72 |
| Bokelman (Moffitt Heart)<br>1720 Sawyer Lane<br>Mechanicsburg, PA 17050 | Bokelman (Moffitt Heart)<br>1720 Sawyer Lane<br>Mechanicsburg, PA 17050 | | 57,139.72 |
| Leite, Dr. Louis P<br>5600 Pine Hurst Way<br>Mechanicsburg, PA 17050 | Leite, Dr. Louis P<br>5600 Pine Hurst Way<br>Mechanicsburg, PA 17050 | | 57,139.72 |
| Bailey, Dr. Robert (Moffitt Heart)<br>1842 Sandhill Road<br>Hershey, PA 17033 | Bailey, Dr. Robert (Moffitt Heart)<br>1842 Sandhill Road<br>Hershey, PA 17033 | | 57,139.72 |
| Dailey, Dr. and Mrs. Stephen<br>2740 Allen Glen Drive<br>Mechanicsburg, PA 17055 | Dailey, Dr. and Mrs. Stephen<br>2740 Allen Glen Drive<br>Mechanicsburg, PA 17055 | | 57,139.72 |
| Owens, Dr. and Mrs. Scott<br>4974 Farmington Road<br>Harrisburg, PA 17112 | Owens, Dr. and Mrs. Scott<br>4974 Farmington Road<br>Harrisburg, PA 17112 | | 57,139.72 |
| Alfano, Linda S<br>115 Pelham Road<br>Camp Hill, PA 17011 | Alfano, Linda S<br>115 Pelham Road<br>Camp Hill, PA 17011 | | 57,139.72 |

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of claim |
|---|---|---|---|
| Patt, Douglas C<br>5036 Hamilton Blvd<br>Allentown, PA 18706 | Patt, Douglas C<br>5036 Hamilton Blvd<br>Allentown, PA 18706 | | 57,139.72 |

## Schedule 2

### Secured Creditors

| Names and Address | Amount of Claim | Brief description of collateral |
|---|---|---|
| M & T Bank<br>P.O. Box 1302<br>Buffalo, NY 14240 | $6,600,000.00 plus accrued interest | All assets |

## Summary of Assets and Liabilities

| | Balance |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Cash** | **$ 320,007.38** |
| **Accounts Receivable - Net of Allowance for Doubtful Accounts** | **2,942,119.91** |
| **Other Current Asset** | **463,123.43** |
| **Total Current Assets** | **3,725,250.72** |
| **Fixed Assets - Net** | **8,670,035.38** |
| **Other Assets** | |
| **Prepaid Financing Fees - Net** | **363,639.89** |
| **Deferred Contract Costs - Net** | **683,221.53** |
| **Security Deposits** | **29,557.00** |
| **Total Other Assets** | **1,076,418.42** |
| **Total ASSETS** | **$ 13,471,704.52** |
| **LIABILITIES & EQUITY** | |
| **Current Liabilities** | |
| **Accounts Payable** | **$ 2,625,999.30** |
| **Other Current Liability** | **7,654,332.36** |
| **Total Current Liabilities** | **10,280,331.66** |
| **Long Term Liabilities** | **17,708,158.14** |
| **Equity** | |
| **Common Stock and Treasury Stock** | **16,537,962.63** |
| **Retained Earnings** | **(28,276,733.69)** |
| **Net Income** | **(2,778,014.22)** |
| **Total Equity** | **(14,516,785.28)** |
| **Total LIABILITIES & EQUITY** | **$ 13,471,704.52** |

**Schedule 4**

**Premises Owned, Leased, or Held Under Other Arrangement**

| Location | Nature of Interest |
|---|---|
| 120 South 16th St.<br>Lebanon, PA 17042 | Owned |

Additionally, the Debtor leases certain real property upon which the Debtor's communications towers are located.

**Schedule 5**

**Pending Litigation**

| Name of Matter | Nature of Claim | Status |
|---|---|---|
| McGlone v. Last Mile, Inc. M.D.Pa. Case No. 1:10-cv-01409 | Wrongful Termination | Debtor's Summary Judgment Motion Pending |

<u>**Schedule 6**</u>

**Debtor's Senior Management**

| Name | Tenure | Title |
|------|--------|-------|
| Darol Lain | 2003 - Present | Chairman, President & CEO |
| Bob Roland | July 2003 - Present | Chief Development Officer |

**Darol Lain, Chairman, President & CEO**
Darol Lain joined Sting Communications as President and Chief Executive Officer in 2003. Since his appointment, Sting has grown by more than tenfold in revenue and completed a "makeover" from a wireless ISP business model to becoming one of the region's fastest growing Next Generation Telecommunications service providers. During his six-year tenure as CEO, Sting has deployed the Mid-Atlantic Region's most advanced "Carrier Ethernet" network. His original vision to bring advanced broadband services to underserved markets now encompasses 2,300 miles of fiber throughout Pennsylvania & Ohio. The Company was recognized as the Technology Company of the Year by the Technology Council of Central Pennsylvania in 2007. Prior to joining Sting, Darol held a number of senior executive positions with Sprint, US WEST & IDCI. Over his 22 year career in the telecommunications industry, Lain has been a recognized leader in the data communications and Internet service markets. He holds a B.S. and M.S. in Economics from University of Wyoming.

**Bob Roland, Chief Development Officer**
Bob Roland has over 25 years experience in product management, business development and marketing within the Information Technology and Telecommunications industries. Bob joined Sting in July 2003. His background and leadership provided the experience and context to re-shape Sting Communications into a leader in converged network/data communications services. Since joining Sting, Bob has played a strategic role in business development and operations, leading the growth in network coverage, services offered and sales. Prior to Sting, Bob held numerous senior-level positions with technology and telecommunications market leaders including, Sprint, Litton Industries and IntelliMark. Roland is active in the Telecom and IT related industries as a contributing author to several trade groups and publications. He holds a B.A. from Penn State in Business Administration & Marketing with a sub-major in Finance.

**Schedule 7**

**Proposed Amounts To Be Paid To The Debtors' Officers, Stockholders, Directors And Financial or Business Consultants For Services For The Thirty-Day Period Following The Commencement of The Debtors' Chapter 11 Cases**

| Name: | Title: | Approx. Amount: |
|---|---|---|
| Darol Lain | Chairman, President & CEO | $16,500.00 |
| Robert Roland | SVP Business Development | $13,500.00 |
| **Total:** | | $30,000.00 |

## **Schedule 8**

Projected 13-week Cash Flow